IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| CASCADIA WILDLANDS PROJECT, et al., | Civ. No. 08-6198-HO |
| Plaintiffs, | ORDER |
| v. | |
| WILLIAM ANTHONY, et al., | |
| Defendants. | |

### Background

The complaint alleges that the United States Forest Service violated the National Forest Management Act (NFMA), the National Environmental Policy Act (NEPA) and the Administrative Procedure Act (APA) in planning and approving the GW Fire Timber Salvage Project on the Sisters Ranger District of the Deschutes National Forest.

The GW Fire started on August 31, 2007 in the Mount Washington Wilderness and burned 6,029 acres of Forest Service land. In the Final Decision Memo (DM) dated June 27, 2008, Sisters District Ranger William Anthony authorized the salvage

logging of about 2.86 million board feet (mmbf) of fire killed timber from approximately 218 acres in the Matrix and General Land allocations in the GW Fire Area, including five acres of roadside tree removal, construction of .25 mile of temporary road to access harvest unit 4, and post-harvest tree planting on 213 acres. Anthony determined the project to be categorically excluded from further analysis and documentation in an environmental impact statement (EIS) or environmental assessment (EA) as a project involving the salvage logging of less than 250 acres of dead or dying trees and construction of less than one half mile of temporary road.

Plaintiffs seek declaratory and injunctive relief and fees and costs. Plaintiffs filed a motion for temporary restraining order and preliminary injunction. The parties fully briefed the motion and the court heard the parties' oral arguments. For the reasons discussed below, plaintiffs' motion for preliminary relief is denied.

## Standard of Review

> A preliminary injunction is appropriate when a plaintiff demonstrates either: (1) a likelihood of success on the merits and the possibility of irreparable injury; or (2) that serious questions going to the merits were raised and the balance of hardships tips sharply in [the plaintiff's] favor. These two options represent extremes on a single continuum: the less certain the district court is of the likelihood of success on the merits, the more plaintiffs must convince the district court that the public interest and balance of hardships tip in their favor.

2 - ORDER

The Lands Council v. McNair, - - - F.3d - - -, 2008 WL 2640001, *3 (9th Cir.) (internal quotations and citations omitted).

The APA provides for review of decisions under NEPA and NFMA. Id. at *4. "The APA states that a reviewing court may set aside only agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" Id., (citing to 5 U.S.C. § 706(2)(A)). A decision is arbitrary and capricious

> only if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

Id. (internal citations and quotations omitted).

## Discussion

Plaintiffs contend that defendants violated NFMA in three ways related to the Aquatic Conservation Strategy (ACS) of the Northwest Forest Plan (NFP). Plaintiffs argue that defendants violated NFMA by (1) failing to assess whether the project complies with the ACS over the short term and at the project level, (2) disregarding substantial evidence that the project will impermissibly retard or prevent attainment of ACS Objectives 2 and 5, and (3) failing to provide information regarding (a) existing watershed conditions with respect to sediment regime, stream channel stability and riparian reserves, and (b) the

3 - ORDER

historic range of variability for the watershed sediment regime and stream channel stability.

The Final DM states that the decision complies with, and will not impede attainment of, the ACS objectives at the project and fifth field watershed levels. Pl's ex. 1 at 12. A document entitled Aquatic Biological Assessment and Evaluation for Threatened, Endangered, and Sensitive Species for the GW Project (ABAE) dated June 11, 2008, states that the project complies with ACS objectives at the fifth field watershed level. Def's ex. 17, Attach. I. The content of this ABAE indicates that the authoring scientist considered project level impacts over the short term. Id. at 12-15.

Plaintiffs contend that the June 11, 2008 ABAE contains conclusions regarding compliance with ACS objectives that contradict conclusions reached in an earlier ABAE dated February 27, 2008, and that the new conclusions are not supported by new analysis or data. Plaintiffs argue that the author arbitrarily altered conclusions based on a new understanding that NFMA requires compliance with ACS objectives over the short-term and at the project level, and not simply at the fifth field watershed level. Counsel for defendant argued at oral argument that apparently conflicting provisions of the ABAEs may have resulted from the correction of clerical or typographical errors. This argument is unsupported by evidence apart from the two ABAEs.

4 - ORDER

Accepting plaintiffs' argument that the biologist prepared the June 11, 2008 ABAE to accommodate the Forest Service's recent understanding that it must assess project compliance with the ACS objectives at the project level over the short term, the court is nonetheless likely to defer to the biologist's conclusions, as the latter ABAE appears to the court to provide a reasoned evaluation of the relevant factors. Selkirk Conservation Alliance v. Forsgren, 336 F.3d 944, (9th Cir. 2003) (citing to Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 377-78 (1989)).

The NFP Basis for Standards . . . B-10 does not specify that particular features identified by plaintiffs must be discussed. The ABAE describes existing watershed conditions, including overland flow and sediment delivery. Def's ex. 17, attach I at 6-8. The ABAE provides a reasoned explanation for the conclusion that the project will maintain the physical integrity of the aquatic system in the project area and watershed. Id. at 12. Plaintiffs appear to argue that the ABAE cannot rely on pre-fire watershed analysis, because such analysis does not account for changed conditions resulting from the fire and fire-fighting activities. The Forest Service has studied the burned area and described conditions in the ABAEs. Def's exs. 2, 17, attach I. The NFP does not appear to require a new watershed analysis before the Forest Service may assess whether a timber salvage

5 - ORDER

project will comply with ACS objectives. NFP Basis for Standards . . . B-20; NFP Standards and Guidelines C-7.

Next, plaintiffs contend that the project violates NEPA because the Forest Service failed to consider cumulative impacts of the project in conjunction with the GW Fire Danger Tree Abatement Project in the same planning document. Plaintiffs further argue that the two projects have cumulative impacts, and that the Forest Service impermissibly segmented the cumulative projects so each would fit within a categorical exclusion (CE) from NEPA documentation. (The abatement project authorizes approximately 1.6 mmbf of salvage logging of danger trees along primary Forest Service system roads on 448 acres within the GW Fire Project area. Pl's ex. 10; Pl's ex. 19 at 10.)

Though there is some overlap, the purposes and needs for the abatement and salvage projects are sufficiently distinct that the Forest Service reasonably declined to plan the projects simultaneously utilizing one set of documents. The abatement project authorizes removal of likely and imminent danger trees along primary public and administrative routes while taking advantage of an opportunity to recover the value of some of the danger trees. Def's ex. 4. In contrast, the salvage project primarily authorizes the removal of merchantable timber while resolving dangerous conditions on only 5 acres adjacent to commercial haul routes. Def's ex. 1. Anthony stated that the

projects are not interdependent, and the abatement project would have been necessary to provide safe public access regardless of whether the salvage project received approval. Anthony Decl., ¶ 11.

Plaintiffs do not challenge the danger tree abatement project or CE 31.2(13) for salvage of dead and/or dying trees not to exceed 250 acres and requiring no more than one half mile of temporary road construction. Pl's ex. 9 at 15. Plaintiffs do not argue that a particular listed extraordinary circumstance precludes the use of CE 31.2(13). Id. at 6. The biologist considered the abatement project in the ABAE. Def's ex. 17, attach I at 9. Plaintiffs do not explain, and the court does not perceive, how the abatement project may cumulatively impact soil conditions in the salvage project activity units.

Finally, serious questions are not raised with respect to plaintiffs' argument that the conclusions of the soil scientist that the salvage project complies with soil condition guidelines are arbitrary and capricious because the scientist considered only harvest units in his analysis, and failed to consider "all system roads, landing, spur roads, and skid roads or trails[.]" Plaintiffs misread the soils report for the salvage project. For purposes of the effects analysis, the soil scientist divided the project area into 12 activity areas, and focused his analysis not on harvest units, but on activity area units containing

7 - ORDER

acreage proposed for salvage logging. Pl's ex. 22 at 5. The description of existing conditions notes that soil disturbance in the activity areas primarily results from transportation systems, temporary roads, landings and skid trails. Id. at 6. The effects analysis also discusses these features. Id. at 11, 15-16. Graphical tables refer to activity area units, not timber harvest units. Id. at 16.

Regarding the balance of hardships and possibility of irreparable harm, 218 acres of salvage logging of dead and/or dying trees, less 6 snags per acre, will be delayed if the project is enjoined. Plaintiffs submitted declarations stating that three members of the Sierra Club and one member of Cascadia Wildlands Project use the GW Fire Area for personnel, professional, educational, recreational, spiritual and/or aesthetic purposes. Decls. of Riverwind, Laughlin, Miller and Rodrigo. Josh Laughlin of Cascadia Wildlands Project also states that he uses the fire area to "groundtruth" the Forest Service's NEPA file for the salvage project. Laughlin Decl., ¶ 3. According to the Forest Service, delaying harvest until mid-October 2008 would result in a potential loss in value of roughly $90,000. The government further contends that the full value of the timber, approximately $190,000, could be lost if the project is enjoined until some unspecified date after mid-October 2008. Plaintiffs argue that the mightiest economy on earth can afford

8 - ORDER

the temporary stay of a timber sale on public land. This unhelpful argument appears beyond dispute.

Factions of the public favor and oppose salvage logging. The public interest may ordinarily disfavor a project that violates NFMA or NEPA. At this preliminary stage, the salvage project appears to the court to be lawful. Forest Service scientists have concluded that the project complies with ACS objectives and soil condition guidelines. There appear to be no extraordinary circumstances that warrant further NEPA review. The public interest does not favor an injunction.

Plaintiffs do not demonstrate serious questions or likelihood of success on the merits of their claims, the balance of hardships does not tip sharply in plaintiffs favor and the possibility of "irreparable harm" is limited to the loss of the dead or dying trees that would be salvaged. Balanced against the loss of dead or dying trees is the potential loss in value of $90,000 to $190,000 should the court enjoin the project.

## Conclusion

Based on the foregoing, plaintiffs' motion for temporary restraining order and preliminary injunction [#3] is denied.

IT IS SO ORDERED.
DATED this 5th day of August, 2008.

_____
United States District Judge

9 - ORDER